IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 15-00044-01-CR-W-DGK |
| Evandro DaCruz-Mendes, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS (Doc. #37) filed on March 9, 2016 by defendant Evandro DaCruz-Mendes ("Mendes"). On November 22, 2016, the undersigned held an evidentiary hearing on Mendes' motion. Mendes was present and represented by his counsel, Assistant Federal Public Defender Robert Kuchar. The government was represented by Assistant United States Attorney Bruce Clark. At the evidentiary hearing, testimony was given by five witnesses: the defendant himself; Officer Mark Merrill, Detective Antonio Garcia, and Errol Riggins with the Kansas City, Missouri Police Department; and an expert witness, Sara Gardner. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Passport |
| Gov't. #2 | Bus ticket |
| Gov't. #3 | Police report |
| Gov't. #4 | Consent to search form |
| Gov't. #5 | *Miranda* waiver |
| Def't. #1 | Gardner CV |
| Def't. #2 | Gardner expert report |
| Def't. #3 | Affidavit |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT[1]

1. Mark Merrill is an officer with the Kansas City Missouri Police Department. Tr. at 3-4.

2. Antonio Garcia is a detective with the Kansas City, Missouri Police Department. Tr. at 19.

3. On February 3, 2015, Officer Merrill and Detective Garcia were working with the interdiction squad at the Kansas City Greyhound bus terminal. Tr. at 5, 19.

4. Officer Merrill observed an individual – later identified as Mendes – exit a Greyhound bus that had originated in Dallas, Texas. Tr. at 5.

5. Officer Merrill noted that Mendes was only carrying one small duffle bag – a suspicious indicator of a possible drug smuggler. Tr. at 5, 10-11.

6. Officer Merrill observed Mendes walk into the lobby area of the terminal then straight out the door to the taxi area. Tr. at 5-6, 11.

7. Officer Merrill approached Mendes, identified himself, and asked (in English) if he could talk to Mendes. Tr. at 6-7, 13.

8. Mendes responded (in English) "Yes, inside." Tr. at 6, 14, 17.

9. Officer Merrill and Mendes went back into the terminal lobby area. Tr. at 6.

---

[1] In making these findings, the Court has been required to make some credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding the encounters with Mendes and Mendes' testimony regarding the encounters. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concludes that, in general, where there were conflicts, the officers were more credible witnesses.

In addition, the Court has considered the expert testimony of Sara Gardner. While the Court found Ms. Gardner generally credible with regard to her factual testimony, it rejects her ultimate conclusion that Mendes' lacked the proficiency in Spanish to knowingly understand and waive his rights. Ms. Garner's opinion was based on a one conversation with Mendes (which Mendes knew was taking place to test his Spanish proficiency). In contrast to that conversation, the Court heard other credible evidence of Mendes' ability to communicate in Spanish in considerable detail with Detective Garcia over a two hour period. Further, as reported by Ms. Gardner herself, Mendes has not lived in Brazil since 2002 and has communicated in the United States in Spanish and English since that time.

10. Officer Merrill then asked Mendes (in English and Spanish) if he could see his bus ticket and his passport. Tr. at 7.

11. Mendes produced a ticket and a passport, but he appeared nervous. Tr. at 8.

12. The ticket and the passport were in different names. Tr. at 8.

13. Officer Merrill told Mendes that he was performing drug interdiction looking for individuals carrying narcotics and firearms and asked (in English and Spanish) if he could look in Mendes' bag. Tr. at 8-9, 18.

14. Mendes said (in English) "yes" and pointed to his bag. Tr. at 9, 15, 18.

15. Officer Merrill then began searching the bag. Tr. at 9.

16. Mendes did not voice any objection to the search. Tr. at 9.

17. The search of the bag uncovered two Tupperware containers wrapped in green plastic wrap that contained methamphetamine. Tr. at 9.

18. Officer Merrill asked Mendes about the containers and Mendes replied (in English) "I don't know." Tr. at 10.

19. At no point during the conversations in English between Officer Merrill and Mendes did Mendes indicate that he did not understand what was being said or indicate that he did not understand English. Tr. at 10, 14-15.

20. After searching the bag, Officer Merrill placed Mendes under arrest and transported him to an office at the bus terminal for an interview. Tr. at 20.

21. Detective Garcia was then asked to come to the office to assist in communicating with Mendes. Tr. at 20.

22. Detective Garcia presented Mendes with a written copy of the *Miranda* rights which Mendes read aloud in Spanish to Detective Garcia. Tr. at 20-21.

23. Mendes informed Detective Garcia – in Spanish – that he understood his rights and signed the *Miranda* waiver. Tr. at 20, 22.

24. At no point during the conversations in Spanish between Detective Garcia and Mendes did Mendes indicate that he did not understand what was being said or indicate that he did not understand Spanish. Tr. at 22.

25. Detective Garcia then interrogated (in Spanish) Mendes who indicated that upon arriving in Kansas City he was supposed to call a telephone number and inform a man of his arrival and then proceed to a hotel in Independence, Missouri. Tr. at 23.

26. Mendes stated that he had made this trip on six prior occasions and had handed the methamphetamine to a man named Wilson in exchange of $1,000 each time. Tr. at 23-24.

27. Mendes related the information to Detective Garcia in Spanish. Tr. at 24.

28. Detective Garcia then asked Mendes (in Spanish) for permission to search his cell phone. Tr. at 24.

29. Mendes consented to the search, reading out loud in Spanish a written consent form and signing the form. Tr. at 24.

30. Mendes is from Brazil and his native language is Portuguese. Tr. at 15, 26, 67.

31. Mendes told Garcia that he spoke Portuguese but also understood Spanish. Tr. at 28.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Mendes seeks to suppress the results of the searches of his luggage and his cell phone and to suppress incriminating statements he made to Detective Garcia. As explained below, all of Mendes' suppression arguments largely turn on a single question – given that Mendes' native language is Portuguese, whether or not he adequately understood his rights and knowingly waived those rights.

With regard to the initial encounter between Mendes and Officer Merrill at the taxi area of the bus terminal, the Court concludes that it was consensual and does not implicate the Fourth Amendment. It is well-settled that:

> Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). *See also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) (Fourth Amendment jurisprudence makes "it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions"); *United States v. Richards*, 611 F.3d 966, 968-69 (8th Cir. 2010). As such, Officer

4

Merrill was entitled to ask general questions of Mendes in the taxi area of the bus terminal. By that same reasoning, Mendes was free to answer the officer's questions or, alternatively, to simply walk away. As summarized by the Eighth Circuit:

> There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse. That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline: While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations omitted*).

However, such consensual-encounter questioning does not encompass searching someone's property. Such a rule recognizes that the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. Without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment. *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000). As protection for the citizen from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before undertaking a search of private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

As made clear in the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). In many search and seizure scenarios, the question of

5

legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, law enforcement officers, of course, did not have a warrant to search Mendes' luggage. To that end, the Supreme Court has cautioned:

> [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716 (2009) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967)). In the present case, the government seeks to justify the search of Mendes' bag under an exception to the warrant requirement: consent.

It is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 1803 (1991). In a typical consent-to-search case, the touchstone in analyzing a motion to suppress is whether the consent was voluntary. In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamante*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

(1)  the defendant's age;

(2)  the defendant's general intelligence and education;

(3)  whether the defendant was under the influence of drugs or alcohol;

(4)  whether the defendant was informed of his *Miranda* rights prior to consent; and

(5)  whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

6

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding consent, courts will examine whether the person who consented:

> (1) was detained and questioned for a long or short time;
>
> (2) was threatened, physically intimidated, or punished by the police;
>
> (3) relied upon promises or misrepresentations made by the police;
>
> (4) was in custody or under arrest when the consent was given;
>
> (5) was in a public or secluded place; or
>
> (6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes that Mendes was an adult of seeming adequate intelligence and education. There is no evidence that Mendes was under the influence of any drugs or alcohol nor is there any evidence that he was threatened, physically intimidated, or punished by any officers. Likewise, there is no indication in the record that officers made any promises or misrepresentations to Mendes. With regard to the consent to search the luggage, Mendes was not then in custody.

Nonetheless, Mendes argues that he did not knowingly and voluntarily consent to a search of his luggage because his native language is Portuguese and the encounter with Officer Merrill transpired mostly in English. While the Court does not dispute that Mendes' native language is Portuguese; it is evident, based on the credible evidence, Mendes can communicate sufficiently in English to have knowingly and voluntarily consented to a search of his luggage. Fluency in the language associated with consent is not a Constitutional requirement for finding voluntary consent.

Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances, including "characteristics of the accused and details of the interrogation." *United States v. Luna,* 368 F.3d 876, 878 (8th Cir. 2004). More importantly, "whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Garcia,* 197 F.3d 1223, 1227 (8th Cir. 1999). *See also United States v. Jones,* 254 F.3d 692, 695 (8th Cir.2001) ("The precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."). In addition to other "consent" factors noted above, Mendes answered Officer Merrill's questions in English sufficiently so that a reasonable officer would believe Mendes was consenting to a search of his luggage.[2]

A similar analysis applies to the question of the voluntariness of Mendes' consent to the search of his cell phone. In that instance, the conversations (and written consent) were in Spanish, but Mendes makes the same argument. While the Court notes that even though Mendes was in custody at the time of the cell phone consent, that fact does not change the conclusion of voluntary consent. Mendes conversed for a lengthy period of time with Detective Garcia in Spanish, including providing specific details associated with his involvement in the subject drug operation. Moreover, Mendes read aloud the Spanish version of the consent-to-search form. In addition to other "consent" factors noted above, Mendes exhibited a proficiency in Spanish

---

[2] This conclusion is consistent with other cases where speakers with less-than-fluent-English were found to have consented to a search despite language difficulties. *See, e.g., United States v. Cedano–Medina,* 366 F.3d 682, 684 (8th Cir. 2004); *United States v. Mendoza–Cepeda,* 250 F.3d 626, 629 (8th Cir. 2001); *United States v. Sanchez,* 156 F.3d 875, 878 (8th Cir. 1998); *United States v. Cortez,* 935 F.2d 135, 142 (8th Cir. 1991).

8

sufficient that a reasonable officer would believe Mendes was consenting to a search of his cell phone.

Finally, the Court briefly addresses the validity of Mendes waiver of his *Miranda* rights. The Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying <u>voluntarily</u> in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977) (*emphasis added*). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such

9

special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background,

10

> experience, and conduct of the accused. The government has the
> burden of proving that the defendant voluntarily and knowingly
> waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 421, 106 S.Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*. (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 420.

Assuming (without deciding) that the *Miranda* waiver test is more stringent than consent to search, the Court nonetheless finds that Mendes voluntarily relinquished his rights and waived

11

those rights knowingly. Mendes read the aloud the *Miranda* waiver form in Spanish without apparent difficulty and asked no questions as to the meaning or import of what he read.

Mendes' expert witness argues that the *Miranda* rights are unintelligible to a lay person and can only be truly grasped by an attorney or other person steeped in the law. The Court rejects such an argument. At the heart of the holding in *Miranda* was a basic and comprehensible formulation of a defendant's essential Constitutional rights that were to be presented to a defendant in terms understandable to a non-lawyer. Mendes read those plain language rights (set out in Spanish) aloud, indicated that he understood those rights, signed the waiver document, and thereafter agreed to and did speak with the officers. The Court concludes that Mendes' *Miranda* waiver was voluntary and knowing.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS (Doc. #37) filed on March 9, 2016 by defendant Evandro DaCruz-Mendes .

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

      */s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**